**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Carl Puskavich,

            Plaintiff,

v.

Andrew Saul,
Commissioner of Social Security,

            Defendant.

No. CV-19-0471-TUC-BGM

**ORDER**

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 16). Defendant filed his Answering Brief ("Response") (Doc. 17), and Plaintiff filed his Reply (Doc. 18). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.     BACKGROUND

### A.     Procedural History

On April 18, 2016, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB") and a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of January 25, 2016 due to a history of brain aneurysm, hypertension, light headedness, a shunt in his right leg, difficulty standing for long periods of time, obesity, right knee early osteoarthritis, anxiety,

depression, and a cognitive disorder.  *See* Administrative Record ("AR") at 14, 17, 37–38, 40, 99–102, 119–20, 137–40, 145, 156–57, 162, 251, 253, 262, 269, 339, 346, 371, 375–76, 395, 397–98, 403.   The Social Security Administration ("SSA") denied these applications on August 18, 2016.  *Id.* at 14, 99–135, 137–80.  On October 9, 2016, Plaintiff filed a request for reconsideration, and on December 9, 2016, SSA denied Plaintiff's application upon reconsideration.  *Id.* at 14, 181–88.  On March 21, 2017, Plaintiff filed his request for hearing.  *Id.* at 14, 192–94.  On July 11, 2018, a hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens.  *Id.* at 14, 34–68.  On November 14, 2018, the ALJ issued an unfavorable decision.  AR at 11–26.  On the same date, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on August 23, 2019, review was denied.  *Id.* at 1–6, 249.  On September 27, 2019, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.  *Factual History*

Plaintiff was thirty-nine (39) years old at the time of the first administrative hearing and thirty-seven (37) at the time of the alleged onset of his disability.  AR at 20, 23, 38, 100–101, 119, 139, 156, 234, 251, 253, 262, 269, 346, 371, 403.  Plaintiff has a college degree in finance.  *Id.* at 38, 116, 134, 154, 171, 340.  Prior to his alleged disability, Plaintiff worked as an insurance sales representative, rental car agent, financial service agent, school admissions representative, and educational sales associate.  *Id.* at 40, 116, 134, 154, 171, 295–300, 308–315, 328–32, 350–56, 382–93.

#### 1.  **Plaintiff's Testimony**

##### a.  **Administrative Hearing**

At the administrative hearing, Plaintiff testified that he has a college degree and majored in finance.  AR at 38.  Plaintiff further testified that he is able to read and can do simple adding and subtracting.  *Id.*  Plaintiff confirmed that he became so disabled that he could no longer work on January 25, 2016.  *Id.*  Plaintiff testified that he was terminated from his job because he becomes "very angry really easy" and was "forgetting more stuff than normal[.]"  *Id.*  Plaintiff testified that his last employment ended in December 2016.

1    *Id.* at 39–40.

2         Plaintiff confirmed that his prior work included insurance sales representative,

3    rental car agent, financial service agent, school admissions representative, and educational

4    sales associate.  AR at 40.  Plaintiff testified that he lives in a house with a seventy (70)

5    year old roommate.  *Id.*  Plaintiff further testified that he wakes up at approximately 6

6    o'clock in the morning and is able to attend to his personal hygiene.  *Id.* at 41.  Plaintiff

7    also testified that he does some household chores including his own laundry, grocery

8    shopping, and keeping his room and bathroom clean.  *Id.* at 41–42.  Plaintiff testified that

9    his roommate generally cares for the house, but he tries to help her by doing the yardwork

10   and sometimes watches her dog.  *Id.* at 41.  Plaintiff further testified that he enjoys watching

11   sports and estimated that he watched three (3) to four (4) hours of television per day.  AR

12   at 42.  Plaintiff also estimated that he was on the computer for approximately three (3) to

13   four (4) hours daily.  *Id.*  Plaintiff testified that he does not exercise and cannot run because

14   of his knee.  *Id.*  Plaintiff confirmed that he has a driver's license and the longest he can

15   drive is approximately an hour and a half.  *Id.*  Plaintiff mentioned sometimes going to the

16   movies as his only activity outside of his home.  *Id.* at 42–43.

17        Plaintiff confirmed that he had a brain hemorrhage, and suffers from hypertension,

18   cognitive problems, obesity, and depression.  AR at 40.  Plaintiff testified that he has

19   trouble sleeping and estimated that he is able to sleep five (5) or six (6) hours per night

20   when he takes a sleeping pill.  *Id.* at 43.  Plaintiff further testified that he receives treatment

21   from a primary care physician at Carondelet and goes to Pathways for his mental health

22   treatment.  *Id.*  Plaintiff also confirmed that his medications include Bupropion, Ibuprofen,

23   Losartan, Trazodone, and Lamotrigine.  *Id.* at 44.  Plaintiff reported that he was not aware

24   of any side effects from his medications.  *Id.*  Plaintiff estimated that he saw a doctor for

25   his physical issues approximately once every two (2) months, and received treatment at

26   Pathways every three (3) weeks from his therapist and once per month from a doctor.  AR

27   at 44–45.

28        Plaintiff indicated that his right knee really bothers him, and reported that an

orthopedist said that he did not have much cartilage left and had a torn meniscus.  *Id.* at 45–46.  Plaintiff also noted that his knee requires surgery, but he has been putting it off because of the number of prior surgeries he has undergone.  *Id.* at 45.  Plaintiff estimated that he can stand for approximately twenty (20) minutes, but then his knee begins to hurt requiring him to sit down.  *Id.* at 46.  Plaintiff described the pain as a sharp, constant pain and rated it at approximately an eight (8) on a scale of one (1) to ten (10), with ten (10) being the worst.  *Id.* at 46–47.  Plaintiff estimated that he could lift approximately five (5) pounds but indicated he did not have any problems sitting.  AR at 46.

Plaintiff described his mental health issues as causing anger.  *Id.* at 47.  Plaintiff explained that it did not take much for him to become angered, and once he is angry, it becomes very difficult to focus.  *Id.*  Plaintiff also described having terrible short-term memory.  *Id.*  Plaintiff attributed these issues to his aneurysm, noting that since that time his anger issues have prevented him from maintaining continuous employment.  *Id.* at 48–52.  Plaintiff also testified that he has problems with his right hand specifically, but the right side of his body generally.  AR at 52.  Plaintiff opined that although he could probably cut one tomato right-handed, he would not be able to cut twenty (20) in a row.  *Id.* at 52–53.  Plaintiff also expressed frustration at his short-term memory loss and opined that these issues are increasing his depression.  *Id.* at 53–54.

### b.  Administrative Forms

#### i.  *Function Report—Adult*

On June 30, 2016, Plaintiff completed a Function Report—Adult.  AR at 362–70.  Plaintiff reported that he lived in a house with family.  *Id.* at 362.  Plaintiff described the limitations of his medical conditions as follows:

> I have a hard time learning new information and focusing on things.  My memory is also not what it used to be and often have to be told several times to do the same thing.  I have a very limited attention span.  It seems like I also get upset easier now and often times feel depressed about my situation.  There are times when I sit in the dark and want to be left alone.

*Id.*  Plaintiff described his usual day as waking up early because he has trouble sleeping,

1    sitting in his room for a while, watching some television, sometimes taking a nap, going to

2    his afternoon part time job, returning home, eating dinner, and going to bed early. *Id.* at

3    363. Plaintiff reported that he does not take care of any other people or pets. *Id.* Plaintiff

4    also reported that prior to his accident he was a manager, but he can no longer do the same

5    thing due to difficulty understanding and learning new things. AR at 363. Plaintiff

6    indicated that his illness affects his sleep, and he rarely sleeps through the night and tosses

7    and turns. *Id.* Plaintiff reported that he has no issues with his personal hygiene. *Id.* at 364.

8    Plaintiff further reported that he sets an alarm on his phone to remind him to take his

9    medication. *Id.*

10    Plaintiff indicated that he mostly prepares frozen meals because he is not a good

11    cook. *Id.* Plaintiff also reported that he prepares food daily, but overall cooks less than

12    before his illness. AR at 364. The only household chore Plaintiff reported was cleaning

13    the toilet, which he estimated took approximately five (5) minutes. *Id.* at 365. Plaintiff

14    further reported that he cannot stand or walk for very long, which limits the house or yard

15    work that he can perform. *Id.* Plaintiff indicated that he does not go outside very often,

16    because he does not like to be around other people and finds difficulty with the heat. *Id.*

17    Plaintiff also reported that he can drive and go out alone. *Id.*

18    Plaintiff indicated that he shops in stores, as well as by computer, for groceries

19    including frozen meals and drinks. AR at 365. Plaintiff estimated that this task takes

20    approximately thirty-five (35) minutes. *Id.* Plaintiff reported that he is able to pay bills,

21    handle a savings account, count change, and use a checkbook/money orders, noting that

22    his ability to handle money has remain unchanged. *Id.* at 366. Plaintiff described his

23    hobbies to include watching sports and current movies, which are unchanged from prior to

24    his illness. *Id.* Plaintiff also reported that he does not spend time with others. *Id.* Plaintiff

25    listed work, the grocery store, and the movie theater as the places he goes regularly. AR

26    at 366. Plaintiff noted that he does not need reminding or someone to accompany him to

27    go places. *Id.*

28    Plaintiff reported that his anger issues cause problems getting along with family,

friends, and neighbors, and he does not like to be around people.  *Id.* at 367.  Plaintiff further reported that his illness affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use hands, and get along with others.  *Id.*  Plaintiff also reported that he has trouble seeing out of his right eye and cannot stand or walk for long periods of time.  *Id.*  Plaintiff estimated that he can walk approximately forty (40) feet before requiring resting for ten (10) minutes.  AR at 367.  Plaintiff indicated that he has a very short attention span, estimating it lasts thirty (30) seconds.  *Id.*  Plaintiff finds following written instructions challenging.  *Id.*  Plaintiff also reported that he requires spoken instructions to be repeated several times.  *Id.*  Plaintiff noted that he generally tries to avoid people, but usually does not have an issue with authority figures.  *Id.* at 368.  Plaintiff reported that he had not been fired or laid off from a job because he could not get along with people.  AR at 368.  Plaintiff further reported that he does not handle stress well and has problems if his routine changes.  *Id.*  Plaintiff has not noticed any unusual behavior or fears and does not need any assistive devices.  *Id.*  Plaintiff listed Losartan as the only medication he takes that causes side effects.  *Id.* at 369.  Plaintiff reiterated his difficulty learning new things and retaining new information.  *Id.*  Plaintiff expressed frustration with his inability to maintain employment since his accident.  AR at 369.

### ii.  Work History Report

#### a.  April 18, 2016

On April 18, 2016, Plaintiff completed a Work History Report.  AR at 350–61.  Plaintiff listed his prior work to include an admissions representative, client relationship associate, express rental specialist, flex staff, sales associate, and sales/customer service.  *Id.* at 350.  Plaintiff described all the positions as full time.  *Id.* at 351–56.

#### b.  November 10, 2016

On November 10, 2016, Plaintiff completed a Work History Report.  AR at 382–93.  Plaintiff listed his prior work to include a file clerk, centralized financial services officer, sales agent (licensed and unlicensed), customer service agent, outbound sales

representative, licensed health agent, express rental specialist, client relationship associate, and flex staff.  *Id.* at 382.  Plaintiff described the file clerk position as part time and to include putting together files and calling landlords to get signed leases from them.  *Id.* at 383.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, and writing and completing reports, or performing other similar duties.  *Id.*  Plaintiff further reported that while working he sat and wrote, typed, or handled small objects for four (4) hours per day; and walked for three (3) hours per day; stood, crouched, reached, and handled, grabbed, or grasped big objects for two (2) hours per day; and stopped and kneeled for one (1) hour per day.  *Id.*  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and the heaviest weight he lifted was approximately twenty (20) pounds.  AR at 383.  Plaintiff noted that he carried files approximately 100 feet and then filed them in the filing room.  *Id.*  Plaintiff reported that he was not a supervisor or lead worker, and was not responsible for hiring or firing.  *Id.*

Plaintiff described the centralized financial services officer position as full time, and to include taking inbound calls from students for online schools and answering questions about their financial aid.  *Id.* at 384.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, and writing and completing reports, or performing other similar duties.  *Id.*  Plaintiff further reported that while working he sat and wrote, typed, or handled small objects for eight (8) hours per day; and walked, stood, and handled, grabbed, or grasped big objects for one (1) hour per day.  AR at 384.  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and this was also the heaviest weight he lifted.  *Id.*  Plaintiff noted that the only lifting and carrying involved papers he printed out for students.  *Id.*  Plaintiff reported that he was not a supervisor or lead worker, and was not responsible for hiring or firing.  *Id.*

Plaintiff described the insurance agent position as full time, and to include taking inbound calls from seniors and enroll them in Medicare Advantage plans.  *Id.* at 385.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, but did not require writing and completing reports,

or performing other similar duties.  AR at 385.  Plaintiff further reported that while working he sat and wrote, typed, or handled small objects for eight (8) hours per day.  *Id.*  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and this was also the heaviest weight he lifted.  *Id.*  Plaintiff reported that he was not a supervisor or lead worker and was not responsible for hiring or firing.  *Id.*

Plaintiff described the licensed sales agent position as full time, and to include taking inbound calls from customers regarding their health plans and enrolling them in plans.  *Id.* at 386.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, but did not require writing and completing reports, or performing other similar duties.  AR at 386.  Plaintiff further reported that while working he sat and wrote, typed, or handled small objects for eight (8) hours per day.  *Id.*  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and this was also the heaviest weight he lifted.  *Id.*  Plaintiff reported that he was not a supervisor or lead worker, and was not responsible for hiring or firing.  *Id.*

Plaintiff described the customer service agent position as full time, and to include answering inbound calls from customers and answering questions about their policies or rates.  *Id.* at 387.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, but did not require writing and completing reports, or performing other similar duties.  AR at 387.  Plaintiff further reported that while working he sat and wrote, typed, or handled small objects for eight (8) hours per day.  *Id*.  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and this was also the heaviest weight he lifted.  *Id.*  Plaintiff reported that he was not a supervisor or lead worker, and was not responsible for hiring or firing.  *Id.*

Plaintiff described the outbound services position as full time, and to include making outbound cold calls to businesses solicit unsecured lines of credit for the business.  *Id.* at 388.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, but did not require writing and completing reports, or performing other similar duties.  AR at 388.  Plaintiff further reported that while working

1    he sat and wrote, typed, or handled small objects for eight (8) hours per day. *Id.* Plaintiff

2    also reported that he frequently lifted less than ten (10) pounds, and this was also the

3    heaviest weight he lifted. *Id.* Plaintiff reported that he was not a supervisor or lead worker,

4    and was not responsible for hiring or firing. *Id.*

5        Plaintiff described the licensed health agent position as full time, and to include

6    fielding inbound calls from seniors to enroll in Medicare Advantage plans. *Id.* at 389.

7    Plaintiff reported that the position required him to use machines, tools, or equipment, as

8    well as technical knowledge or skills, but did not require writing and completing reports,

9    or performing other similar duties. AR at 389. Plaintiff further reported that while working

10   he sat and wrote, typed, or handled small objects for eight (8) hours per day. *Id.* Plaintiff

11   also reported that he frequently lifted less than ten (10) pounds, and this was also the

12   heaviest weight he lifted. *Id.* Plaintiff reported that he was not a supervisor or lead worker,

13   and was not responsible for hiring or firing. *Id.*

14       Plaintiff described the express rent specialist position as full time, and to include

15   renting vehicles to customers. *Id.* at 390. Plaintiff reported that the position required him

16   to use machines, tools, or equipment, as well as technical knowledge or skills, but did not

17   require writing and completing reports, or performing other similar duties. AR at 390.

18   Plaintiff further reported that while working he sat and wrote, typed, or handled small

19   objects for eight (8) hours per day. *Id.* Plaintiff also reported that he frequently lifted less

20   than ten (10) pounds, and this was also the heaviest weight he lifted. *Id.* Plaintiff reported

21   that he was not a supervisor or lead worker, and was not responsible for hiring or firing.

22   *Id.*

23       Plaintiff described the client relationship associate position as full time, and to

24   include answering inbound calls from customers about their investments and processing

25   customer withdrawals. *Id.* at 391. Plaintiff reported that the position required him to use

26   machines, tools, or equipment, as well as technical knowledge or skills, but did not require

27   writing and completing reports, or performing other similar duties. AR at 391. Plaintiff

28   further reported that while working he sat and wrote, typed, or handled small objects for

eight (8) hours per day.  *Id*.  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and this was also the heaviest weight he lifted.  *Id*.  Plaintiff reported that he was not a supervisor or lead worker, and was not responsible for hiring or firing.  *Id*.

Plaintiff described the flex staff position as full time, and to include processing investments for customers that mailed in their checks.  *Id*. at 392.  Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, but did not require writing and completing reports, or performing other similar duties.  AR at 392.  Plaintiff further reported that while working he sat and wrote, typed, or handled small objects for eight (8) hours per day.  *Id*.  Plaintiff also reported that he frequently lifted less than ten (10) pounds, and this was also the heaviest weight he lifted.  *Id*.  Plaintiff reported that he was not a supervisor or lead worker, and was not responsible for hiring or firing.  *Id*.

Plaintiff noted that he has had "trouble retaining new information since [his] accident" and has difficulty keeping a job.  *Id*. at 393.

<u>c</u>.  <u>April 25, 2018</u>

Claimant indicated, "No Work History."  AR at 422.

**2.  <u>Vocational Expert Christopher Salvo's Testimony</u>**

Mr. Christopher Salvo testified as a vocational expert at Plaintiff's administrative hearing.  AR at 14, 54–67.  Mr. Salvo noted Plaintiff's extensive work history and indicated that he had made initial findings, but additional information may be required.  *Id*. at 54–55.  Mr. Salvo described Plaintiff's past work as a Client Relationship Associate in Financial Services as a customer service representative, Dictionary of Occupational Titles ("DOT") number 205.362-026, with a Specific Vocational Preparation ("SVP") of 6, skilled, and a light exertional level.  *Id*. at 55.  Mr. Salvo described Plaintiff's position at Express Rent-A-Car as an auto rental clerk, DOT number 295.467-026, semiskilled, with an SVP of 4, and light exertional level as normally performed; however, Plaintiff performed it at the sedentary level.  *Id*.  Mr. Salvo described Plaintiff's position at Flex Staff Investments as an administrative clerk, DOT number 219.362-010, semiskilled, with

an SVP of 4, and light exertional level.  *Id.*  Mr. Salvo described Plaintiff's position as an Account Executive for Mortgages as an account executive, DOT number 186.267-018, skilled, with an SVP of 7, and sedentary exertional level.  AR at 55–56.  Plaintiff explained that he was promoted to a manager from this position, and Mr. Salvo described that position as a manager, financial institution, DOT number 186.167-086, skilled, with an SVP of 8, and sedentary exertional level.  *Id.* at 57–58.  After receiving clarification about Plaintiff's position as an admissions representative in education, Mr. Salvo described the position as telephone solicitor, DOT number 299.357-014, semiskilled, with an SVP of 3, and sedentary exertional level.  *Id.* at 56.  Lastly, Mr. Salvo described the position of salesperson in general merchandising, DOT number 279.357-054, semiskilled, with an SVP of 3, and light exertional level.  *Id.* at 56–57.

The ALJ asked Mr. Salvo to consider a hypothetical individual of Plaintiff's age, education, and work experience, who could sit for six (6) hours out of an eight (8) hour day; walk four (4) hours out of an eight (8) hour day; occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; only occasionally climb, balance, stoop, kneel, crouch, and crawl; only occasionally have exposure to heights, moving machinery, and loud noise; has mental restrictions, including only being able to understand, remember, and carry out simple job instructions; only have occasional interaction with coworkers, the public, and supervisors; and who requires a low stress position.  *Id.* at 58.  The ALJ defined occasional as "very little to one-third of the time."  AR at 58.  Mr. Salvo opined that such an individual could not perform any of Plaintiff's previous jobs because they were all above the simple level.  *Id.* at 58–59.  Mr. Salvo indicated that he equated simple and repetitive to unskilled.  *Id.* at 59.  Mr. Salvo testified that there would be other jobs in the national economy for such an individual; however, he noted that although he would consider the jobs to be low stress, there are production standards and stress is unique to the individual.  *Id.*  Mr. Salvo opined that such an individual could perform the job of small products assembler, DOT number 706.684-022, with an SVP of 2, unskilled, light exertional level, and 35,000 positions in the national economy.  *Id.*  Mr. Salvo further

1    testified that such an individual could perform the job of production assembler, DOT

2    number 706.687-010, with an SVP of 2, unskilled, and light exertional level.  AR at 59.

3    Mr. Salvo eroded the number of jobs available in the national economy to exclude those

4    positions that included working around moving machinery, on an assembly line, or in

5    tandem with any other worker.  *Id.*  With this reduction, Mr. Salvo testified that there would

6    be at least 15,000 production assembler jobs available in the national economy for such an

7    individual.  *Id.*  Mr. Salvo testified that such an individual could also perform the job of

8    photocopy machine operator, DOT number 207.685-010, unskilled, light exertional level,

9    and 3,000 available positions in the national economy.  *Id.* at 60.  The ALJ indicated that

10   the hypothetical individual could not perform a full range of light work, and Mr. Salvo

11   indicated that this would require eroding the number of jobs by half.  *Id.* at 60–61.  As

12   such, he opined that there would be 17,500 assembly jobs, 7,500 production assembler

13   jobs, and 1,500 photocopy machine operator jobs in the national economy.  AR at 60–61.

14           Upon questioning by Plaintiff's counsel, Mr. Salvo acknowledged that if such an

15   individual made a mistake, and the supervisor or a coworker brought it to their attention,

16   and that individual could not accept any type of constructive criticism, they may be let go.

17   *Id.* at 61–62.  Mr. Salvo further testified that while a supervisor may not be in close physical

18   proximity to the worker a lot of the time, there is occasional supervision to make sure that

19   the individual is performing the duties and functions correctly.  *Id.* at 62.  Mr. Salvo defined

20   occasional as one (1) to thirty-three (33) percent of the time.  *Id.*  Mr. Salvo also opined

21   that if every time there was a possible correction or suggestion that a task be performed

22   differently, and the individual responded inappropriately on an ongoing basis, such an

23   individual would be let go.  *Id.*  Mr. Salvo also acknowledged that if such an individual

24   walked off a job without any information to a supervisor or other coworker, they would

25   not be welcomed back.  AR at 62–63.

26           Plaintiff's counsel further modified the ALJ's hypothetical individual to include a

27   limitation in the right upper extremity to frequent handling and fingering.  *Id.* at 63–64.

28   Mr. Salvo opined that an individual with this additional limitation would be able to perform

the jobs of eye glass polisher, DOT number 713.684-038, unskilled, sedentary exertional level; lens inserter, DOT number 713.687-026, unskilled, sedentary exertional level; and eyeglass frame inspector, DOT number 713.684-022, unskilled, sedentary exertional level. *Id.* at 65. All of these jobs are in the optical goods industry. *Id.* Mr. Salvo testified that combined, there are approximately 4,000 positions in the national economy. *Id.* Mr. Salvo also confirmed that his opinion regarding the production assembler and assembly work jobs did not include using moving machinery, conveyor belts, or working in tandem, and in his opinion, there would be noise but not loud noises. AR at 66.

### 3.  Lay Witness Testimony

#### a.  Christopher Jurvig

On June 3, 2018, Christopher Jurvig wrote a letter regarding Plaintiff. AR 424–25. Mr. Jurvig indicated that he and Plaintiff met while they were attending the University of Arizona. *Id.* at 424. Mr. Jurvig recounted Plaintiff's success after college as a branch sales manager and real estate investor. *Id.* Mr. Jurvig recalled the seriousness of Plaintiff's condition after his 2006 aneurysm. *Id.* Mr. Jurvig acknowledges that Plaintiff is a "walking miracle"; however, he notes that Plaintiff does not have much of a filter and tends to say inappropriate things at inappropriate times. *Id.* Mr. Jurvig also reported that Plaintiff's living situation is constantly changing, and he is unable to hold down a job. AR at 425. Mr. Jurvig observed that Plaintiff "spends the majority of his time now in public libraries completing online surveys to earn coupons for free meals or a few dollars." *Id.* Mr. Jurvig described Plaintiff as easily winded walking short distances, with poor balance, and poor vision. *Id.* Mr. Jurvig further noted Plaintiff's inability to concentrate for more than a couple of minutes and his memory is very limited. *Id.*

#### b.  Patricia Portnoy

Plaintiff's mother, Patricia Portnoy, wrote a letter regarding Plaintiff. AR 426–28. Ms. Portnoy recounted how Plaintiff was in the gifted program as a child and was very successful throughout school. *Id.* at 426. Ms. Portnoy further described Plaintiff's early career success after college. *Id.* Ms. Portnoy also described Plaintiff's aneurysm and

1    subsequent rehabilitation.  *Id.* at 427.  Ms. Portnoy noted that his vision in his right eye

2    remains impacted, as well as his right leg which causes him to walk with a limp.  *Id.*  Ms.

3    Portnoy explained that despite Plaintiff's attempts to work, he has been unable to maintain

4    employment due to his difficulty in learning new processes, and becomes frustrated and

5    angry easily.  AR at 427.  Ms. Portnoy also observed that Plaintiff has not been successful

6    even with parttime work.  *Id.* at 428.

7                    **4.  Plaintiff's Medical Records[1]**

8           In 2006, Plaintiff suffered an anterior communicating artery aneurysm, with

9    associated vasospasm, subarachnoid hemorrhage, and right-sided weakness.  AR at 434–

10   35, 1229.  Plaintiff was twenty-seven (27) years old at the time of the aneurysm and

11   suffered significant physical, visual, and cognitive deficits.  *Id.* at 1054.

12          On May 2, 2016, Plaintiff was seen by Raymond Bakotic, D.O. to establish care.

13   *Id.* at 1090.  Plaintiff complained of being light-headed, dizzy, tired/fatigued, and nauseous.

14   *Id.*  Aside from the neurologic complaints, Dr. Bakotic's examination of Plaintiff was

15   otherwise unremarkable.  *Id.*  On May 23, 2016, Plaintiff underwent a computerized

16   tomography ("CT") of his head.  AR at 1091, 1126.  Boyd Ashdown, M.D. reviewed

17   Plaintiff's CT scan and noted Plaintiff's "previous treatment of anterior communicating

18   artery aneurysm with a coil mass in the suprasellar cistern[;] . . . evidence of old ischemic

19   changes in the frontal lobes bilaterally[;] . . . a shunt catheter entering from a left frontal

20   approach and the catheter tip is in the region of the right thalamus[;] . . . no hemorrhage,

21   mass effect or shift[;] and [n]o acute ischemic event."  *Id.*

22          On June 1, 2016, Plaintiff returned to Dr. Bakotic for a follow-up.  *Id.* at 1089.

23   Plaintiff reported that he was not having any headaches or chest pain, and Dr. Bakotic's

24   examination was otherwise unremarkable.  *Id.*  On June 14, 2016, Plaintiff returned to Dr.

25   Bakotic for a referral to a neurologist.  *Id.* at 1087.  Dr. Bakotic's examination was

26   unremarkable.  AR at 1087.  On the same date, Plaintiff was seen by Keith O. Gonzalez,

27   _____

28          [1] The Court's summary is generally limited to records from Plaintiff's alleged onset date
     forward.

                                    - 14 -

1   M.D. for a neurology consult.  *Id.* at 1095–96, 1101–03, 1127–29, 1137–39.  Dr.

2   Gonzalez's examination was unremarkable.  *Id.*  Dr. Gonzalez noted Plaintiff's "[s]peech

3   and language are fluent with no errors[;] [f]und of knowledge is adequate[;] [a]bstraction

4   and judgment are intact[;] [m]ood and affect are appropriate to the setting[;] [a]ttention

5   span is normal[;] [and] [m]emory function for recent and remote is intact.  *Id.* at 1095–96,

6   1102, 1128, 1138.  Dr. Gonzalez also noted "[m]uscle bulk is normal throughout[;] [t]one

7   is increased right lower extremity[;] [t]here is no drift of the outstretched upper

8   extremities[;] [p]ower testing is 5/5 proximal and distal in the upper and lower

9   extremities[;] . . . [f]ine coordination in the hands is intact[;] [f]inger-nose-finger is intact

10  with no dystaxia[;] [and] [t]here is no tremor."  *Id.* at 1096, 1102, 1128, 1138.  Dr. Gonzalez

11  further reported a "hemiparetic gait on the right."  *Id.*  On June 24, 2016, Plaintiff was seen

12  by Robert W. Bina, M.D. and Travis M. Dumont, M. D. for a neurological surgery

13  consultation.  AR at 1104–07, 1129–32, 1139–42, 1290–96.  Plaintiff reported "stable right

14  hemiparesis and diminished visual acuity that has been stable since his aneurysmal

15  rupture[,]" as well as tiring easily, weakness, and sleeplessness, but Dr. Bina's examination

16  was generally unremarkable.  *Id.* at 1104–05, 1129–30, 1139–41, 1290–92, 1294–96.

17        On July 28, 2016, Plaintiff underwent a magnetic resonance angiogram ("MRA")

18  of his head.  *Id.* at 1108, 1134–1135, 1144–45, 1297.  Wayne S. Kubal, M.D. reviewed the

19  film and found "[n]o aneurysm, vascular malformation, significant arterial stenosis, arterial

20  cut off, or other significant arterial abnormality."  *Id.*  Dr. Kubal's impression was an

21  "[u]nremarkable noncontrast MRA of the brain."  *Id.*  On September 16, 2016, Plaintiff

22  returned to Dr. Dumont for a follow-up.  AR at 1132–34, 1142–44, 1299–1302.  Dr.

23  Dumont noted that "[t]he new MRA show[ed] no residual whatsoever[,] [and] [Plaintiff]

24  ha[d] no neurological complaints.  *Id.* at 1132, 1142, 1299–1300.  Dr. Dumont's physical

25  examination of Plaintiff was unremarkable.  *Id.* at 1133, 1143, 1299–1301.

26        On April 7, 2017, Plaintiff completed intake with Pathways of Arizona.  *Id.* at 1179.

27  On April 17, 2017, Plaintiff met with Debbie Chendanda for individual counseling.  *Id.* at

28  1180.  Plaintiff identified anger, frustration, losing his temper, short term memory loss, and

inability to maintain employments as areas to address.  AR at 1180.  On April 26, 2017, Plaintiff was seen at Pathways of Arizona for a psychiatric evaluation and individual counseling.  *Id.* at 1156–59, 1181.  Plaintiff reported angering easily, feeling hopeless, isolating, having "no filter," and low self-esteem.  *Id.* at 1156, 1159.  Plaintiff also reported weakness on the right side of his body with pain, and memory loss.  *Id.*  Plaintiff noted that he did not have problems with depression or memory loss prior to his aneurysm.  *Id.* at 1159.  Plaintiff was diagnosed with moderate depression.  AR at 1181.

On May 8, 2017, Plaintiff saw Ms. Chendanda for individual counseling.  *Id.* at 1182.  Plaintiff reported increased fatigue and that he was using breathing exercises for relaxation, which decreased his symptoms of anger and anxiety.  *Id.*  On May 10, 2017, Plaintiff saw Terry Lozier, M.S., N.P., B.H.P. at Pathways of Arizona.  *Id.* at 1161–62. Plaintiff reported no change to his mood, and NP Lozier noted that he had not been taking the medication long enough to impact his mood.  *Id.* at 1161.  On May 22, 2017, Plaintiff saw Ms. Chendanda for individual counseling.  AR at 1183.  Plaintiff reported a lack of motivation but noted that mindfulness alleviated symptoms of anger.  *Id.*  On May 23, 2017, Plaintiff had a teleconference with NP Lozier for a follow-up.  *Id.* at 1163.  Plaintiff reported feeling less depressed.  *Id.*

On June 8, 2017, Plaintiff was seen by NP Lozier for a follow-up.  *Id.* at 1164–65. Plaintiff reported feeling that his depression had improved but struggled with decreased motivation and irritability.  AR at 1164.  On June 8, 2017, Plaintiff saw Ms. Chendanda for individual counseling.  *Id.* at 1185.  Plaintiff reported several incidences during the week where he became very angry but was able to use mindfulness breathing to self-regulate.  *Id.*  On June 19, 2017, Plaintiff saw Ms. Chendanda for individual counseling. *Id.* at 1186.  Plaintiff reported that he was attempting to get himself in a better financial situation by applying for disability and was able to use coping skills to alleviate signs of anger. *Id.*  On June 21, 2017, Plaintiff was seen by A. Michael Badruddoja, M.D. regarding an intracerebral hemorrhage.  AR at 1120–22, 1147–49, 1281–83.  Dr. Badruddoja described Plaintiff as having "residual right-sided weakness and subjective memory

difficulties." *Id.* at 1121, 1149, 1282. Dr. Badruddoja noted that "[d]uring our visit today, [Plaintiff] gives a very lucid history and is very appropriate." *Id.* On June 22, 2017, Plaintiff had magnetic resonance imaging ("MRI") of his right knee. *Id.* at 1226–28, 1245– 46, 1265–66. Wendy McCurdy, M.D. reviewed the images and found a small knee joint effusion; "[r]ed zone tear mid body/anterior horn lateral meniscus with a perimeniscal cysts[,] signal touching the upper surface of the mid body appears globular and degenerative therefore this most indicative of a peripheral red zone tear–not a flap tear"; "[m]ild focal degenerative changes with the focal full-thickness articular cartilage loss anterior central medial tibial plateau and underlying bone marrow edema[,] [n]o medial meniscal tear"; leaking Baker's cyst; and lateral patellar subluxation. *Id.* at 1227–28, 1246, 1266.

On July 3, 2017, Plaintiff saw Ms. Chendanda for individual counseling. AR at 1187. Plaintiff reported increased anger due to doctor appointments which brought knee damage to light. *Id.* Plaintiff reported tuning the doctor out because he was so angry. *Id.* On July 6, 2017, Plaintiff saw NP Lozier for a follow-up. *Id.* at 1166–67. Plaintiff reported feeling less depressed but was very angry dealing with significant situational stress. *Id.* at 1166. On July 12, 2017, Plaintiff underwent an MRI of his brain. *Id.* at 1124–25, 1153. Richard Lucio, M.D. reported [e]ncephalomalacia and old hemorrhage in both ACA territories[;] . . . [v]entricular shunt as noted, with no hydrosephalus[;] . . . [and] [n]o acute or active brain abnormalities." AR at 1124–25, 1153. On the same date, Plaintiff returned to Dr. Badruddoja regarding an intracerebral hemorrhage. *Id.* at 1117–19, 1150–52, 1279– 80. Dr. Badruddoja noted "some right-sided weakness with a slight increase in tone on the right and hyperreflexia on the right[,]" and "a significant amount of encephalomalacia over the ACA distribution" was observed in Plaintiff's MRI scans. *Id.* at 1118, 1151, 1280. Dr. Badruddoja recommended "neuropsychological testing to assess his cognitive deficits objectively[,] . . . due to persistent memory loss." *Id.* at 1118, 1152, 1280. On July 17, 2017, Plaintiff saw Ms. Chendanda for individual counseling. *Id.* at 1188. Plaintiff reported a continued lack of motivation but noted improvement in his ability to manage

1    anger.  AR at 1188.

2          On August 4, 2017, Plaintiff saw NP Lozier for a follow-up.  *Id.* at 1168–69.

3    Plaintiff reported improvement with depression and motivation, as well as sleep, on current

4    medications.  *Id.* at 1168.  Plaintiff also reported that his angry outbursts seemed less

5    frequent.  *Id.*  On the same date, Plaintiff saw Ms. Chendanda for individual counseling.

6    *Id.* at 1190.  Plaintiff reported having received an injection for his knee and going to

7    physical therapy to help with mobility.  AR at 1190.  Plaintiff reported that he was working

8    on not isolating.  *Id.*  On August 21, 2017, Plaintiff again saw Ms. Chendanda for individual

9    counseling.  *Id.* at 1191–92.  Plaintiff opined that medication and breathing techniques are

10   alleviating the anger symptoms.  *Id.* at 1191.

11         On September 11, 2017, Plaintiff returned to Ms. Chendanda for individual

12   counseling.  *Id.* at 1193.  Plaintiff reported getting a membership to the YMCA so he can

13   begin exercising in the pool for his knee.  *Id.*  Plaintiff also reported few incidents of anger.

14   AR at 1193.  On September 25, 2017, Plaintiff saw Ms. Chendanda for individual

15   counseling.  *Id.* at 1194–95.  Plaintiff worked on visualization techniques to assist with

16   depression and anxiety.  *Id.* at 1194.  Plaintiff reported that he had been depressed the

17   previous week.  *Id.*  On September 29, 2017, Plaintiff saw NP Lozier and reported an

18   increase in negative thinking and decreased motivation.  *Id.* at 1170.  Plaintiff also noted

19   continued anger and frustration.  AR at 1170.  Plaintiff reported on-going knee pain, but

20   physical therapy was helping.  *Id.*

21         On October 12, 2017, Plaintiff saw Ms. Chendanda for individual counseling.  *Id.*

22   at 1196.  Plaintiff was extremely frustrated because the therapist did not schedule the

23   Handicar.  *Id.*  Plaintiff reported "continu[ing] to feel very irritated with people and would

24   rather not be around others."  *Id.*  Plaintiff also reported worsening short-term memory

25   issues.  *Id.*  On October 23, 2017, Plaintiff again saw Ms. Chendanda for individual

26   counseling.  AR at 1197.  Plaintiff reported he was making some progress with anger

27   management but was having significant memory issues.  *Id.*

28         On November 3, 2017, Plaintiff saw NP Lozier for a follow-up.  *Id.* at 1172–73.  NP

Lozier reported that Plaintiff's neuro psych evaluation indicated that his short-term memory was worse. *Id.* at 1172. NP Lozier further noted that Plaintiff seemed less angry and irritable. *Id.* On November 6, 2017, Plaintiff saw Ms. Chendanda for individual counseling. AR at 1198. Plaintiff reported continuing frustration and "reported he had a neuropsychological testing last week which was very discouraging as he didn't realize his memory is so poor." *Id.* November 20, 2017, Plaintiff again met with Ms. Chendanda for individual counseling. *Id.* at 1199. Plaintiff reported continued loss of short-term memory, as well as some lack of motivation. *Id.*

On December 4, 2017, Plaintiff saw Ms. Chendanda for individual counseling. *Id.* at 1200. Ms. Chendanda noted that Plaintiff "seemed slightly depressed due to neuropsychiatric report and spent significant part of session sharing his frustration and anger toward doctor and the process." AR at 1200. On December 18, 2017, Plaintiff had another individual counseling session with Ms. Chendanda. *Id.* at 1201–02. Plaintiff reported a lack of motivation to accomplish normal tasks. *Id.* at 1201. Plaintiff attributed this to feeling discouraged since his neuropsychological evaluation. *Id.*

On January 5, 2018, Plaintiff saw NP Lozier and reported an increase in depressed mood, as well as decreased motivation. *Id.* at 1175–76. NP Lozier noted that Plaintiff was walking with a more noticeable limp, and that he stated his knee pain was worse. AR at 1175. On January 22, 2018, Plaintiff saw Ms. Chendanda for individual counseling. *Id.* at 1203. Plaintiff "continue[d] to address [his] anger and frustration, in regard to prior brain injury and health issues." *Id.* Plaintiff also "expressed frustration with dating websites and the women with whom he has met." *Id.* On February 5, 2018, Plaintiff again saw Ms. Chendanda for individual counseling. *Id.* at 1205–06. Plaintiff discussed his anger when driving. AR at 1205. Plaintiff reported that his anger had escalated since his injury. *Id.*

On March 2, 2018, Plaintiff saw NP Lozier for a follow-up and reported that his individual counseling was going well. *Id.* at 1177–78. Plaintiff also reported improved mood and sleep. *Id.* at 1177. On March 5, 2018, Plaintiff saw Ms. Chendanda for individual counseling. *Id.* at 1207. Plaintiff reported that "things [were] going poorly in

regard to managing his anger while driving and also in regard to sports."  AR at 1207.  Ms. Chendanda also noted that Plaintiff was in physical pain and having difficulty walking.  *Id.* On March 19, 2018, Plaintiff saw Ms. Chendanda for individual counseling.  *Id.* at 1208. Plaintiff reported "no change in anger when he is driving."  *Id.*  Plaintiff also reported that he "sometimes feels badly without knowing the reason why[,] [and] he tends to dwell on negative things[.]"  *Id.*  Plaintiff "presented as being in pain during th[e] last several weeks due to further injur[ing] his knee."  AR at 1208.  On March 21, 2018, Plaintiff saw Machelle Strand, FNP regarding his right knee pain and to establish care.  *Id.* at 1272–74.  FNP Strand's examination of Plaintiff was generally unremarkable.  *Id.* at 1273.  On March 29, 2018, Plaintiff was seen by Preston J. Smith, M.D. regarding his right knee pain.  *Id.* at 1240–44, 1260–64.  Dr. Smith assessed primary osteoarthritis of the right knee.  *Id.* at 1243, 1263.  Dr. Smith's impression noted "[f]ull thickness cartilage loss at anterior central medial tibial plateau with underlying bone edema[,] [l]ateral compartment narrowing on [x-ray] with degenerative lateral meniscus changes."  AR at 1243, 1263.

On April 2, 2018, Plaintiff saw Ms. Chendanda for individual counseling.  *Id.* at 1209, 1254.  Plaintiff reported increased memory problems and that "his anger was very bad today[.]"  *Id.*  On April 16, 2018, Plaintiff had another individual counseling session with Ms. Chendanda.  *Id.* at 1210, 1255.  Treatment records indicate that Plaintiff "presents with memory loss and he struggles to remember whether therapist has been told specific things."  *Id.*  On April 27, 2018, Plaintiff saw NP Lozier for medication management.  AR at 1252–53.  Plaintiff reported struggling with anger and irritability, noting "even little things set me off[.]"  *Id.* at 1252.  On April 30, 2018, Plaintiff again saw Ms. Chendanda for individual counseling.  *Id.* at 1256.  The session addressed Plaintiff's "ongoing anger challenges."  *Id.*

On May 3, 2018, Plaintiff was seen by Shannah Biggan, Ph.D., ABPP for a repeat neuropsychological evaluation.  *Id.* at 1229–35.  Dr. Biggan obtained information from a clinical interview of Plaintiff, a review of his October 31, 2017 neuropsychological testing, and a review of available medical records.  AR at 1229.  Plaintiff denied current headaches

but reported occasional lightheadedness and significant balance difficulty. *Id.* Dr. Biggan noted that Plaintiff "continues to have right-sided weakness and reduced coordination." *Id.* Dr. Biggan further noted that Plaintiff was "doing physical therapy for his knee." *Id.* Dr. Biggan described Plaintiff's cognitive situation as follows:

> [H]e still has short term memory issues, including forgetting details of conversations, misplacing items, and forgetting to complete tasks. He felt that short term memory is the primary deficit. He also identified problems with word-finding, multitasking, organization, task completion, and distractibility. He reported that processing speed has improved somewhat, and that problem-solving skills were intact. Reading comprehension is intact, but recall remains weak. Writing and math skills are unchanged, and he manages his own finances.

*Id.* Dr. Biggan observed that Plaintiff "ambulated independently but with a limp of the right leg." AR at 1230. Dr. Biggan also observed that Plaintiff "made frequent negative comments about his memory, and consistently felt he was doing worse than he actually was." *Id.* Dr. Biggan summarized the test results as "show[ing] average intellectual skills, with average verbal comprehension, perceptual reasoning, working memory, and visual process speed[,]" as well as average encoding storage, and retrieval of well-structure auditory material. *Id.* at 1233. Dr. Biggan reported that "[f]or more complex auditory information, [Plaintiff] also shows average encoding speed, low average retention, intact accuracy, and improved retrieval with the structure of recognition cues." *Id.* Dr. Biggan described Plaintiff's "[l]earing and recall of simpler visual details [as] low average to average but encoding and recall of more complex visual material is very poor." *Id.* at 1233–34. Dr. Biggan further reported that Plaintiff's "speed of processing is average to high average at the selective, alternating and divided levels of attention, with good accuracy[,] [and] [m]easures of executive functions show low average mental flexibility and set shifting, but intact verbal problem-solving, speeded fluency, cognitive switching, and inhibitory control skills, with variable accuracy across tasks." AR at 1234. Dr. Biggan noted Plaintiff's "[l]anguage skills, including naming and vocabulary knowledge, are within normal limits[,] [and] [v]isual spatial judgement, mental rotation, and visual

integration skills are intact, but copying skills are poorly organized." *Id.* Regarding Plaintiff's fine motor function, test results showed "[m]annual tapping speed with his right hand was average (53rd percentile), as it was with his left hand (52nd percentile)[;] [however,] [s]peeded dexterity was reduced with his right hand (3rd percentile), as it was with his left hand (<1st percentile)." *Id.* at 1233. Dr. Biggan observed that most of Plaintiff's "cognitive skills have returned to the average range, with the exception of high level visual memory and complex problem-solving and mental flexibility skills[,] [and] [f]ine motor dexterity also remains slow bilaterally." *Id.* at 1234. Dr. Biggan further observed that "[i]ndividuals with such injuries are often able to perform adequately on well-structured psychometric tests, but can have more difficulty with function in less structured social situations." *Id.* Dr. Biggan noted that "[t]he research on the effects of frontal lobe injury on employment further indicates that such persons may have greater difficulty maintaining employment over time, have a greater need for accommodations in their job setting, and often have reductions in earned income." AR at 1235. On May 14, 2018, Plaintiff saw Ms. Chendanda for individual counseling. *Id.* at 1257. The session continued to focus on anger management. *Id.* On May 31, 2018, Plaintiff saw NP Lozier for medication management. *Id.* at 1250–51.

On June 4, 2018, Plaintiff had an individual counseling session with Ms. Chendanda. *Id.* at 1258. Plaintiff "continue[d] to be forgetful in discussions from prior sessions." AR at 1258. The session continued to address Plaintiff's anger and anxiety. *Id.* On July 3, 2018, NP Lozier documented for Plaintiff's disability file his difficulties with short term memory, mood lability, concentration, and focus. *Id.* at 1275. NP Lozier opined that Plaintiff "would have a difficult time engaging in full time employment as a result[.]" *Id.* On the same date, NP Lozier completed a Mental Residual Functional Capacity Assessment regarding Plaintiff. *Id.* at 1276–78. NP Lozier opined that Plaintiff had a marked degree of impairment in his ability to understand, remember, or apply information. AR at 1276. Within this domain, NP Lozier opined that Plaintiff had a marked degree of impairment in his ability to remember locations and work-like procedures and ability to

understand and remember detailed instructions, and a moderate degree of impairment in his ability to understand and remember very short and simple instructions. *Id.* NP Lozier further opined that Plaintiff had a moderate degree of impairment in his ability to interact with others. *Id.* Within this domain, NP Lozier found Plaintiff to have a marked degree of impairment in his ability to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors; a moderate degree of impairment in his ability to ask simple questions or request assistance and get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and a mild degree of impairment in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id.* at 1276–77. NP Lozier further opined that Plaintiff had a marked degree of impairment in his ability to concentrate, persist, or maintain pace. *Id.* at 1277. NP Lozier detailed that Plaintiff had a marked degree of impairment in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and sustain an ordinary routine without special supervision; and a moderate degree of impairment in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR at 1277–78. NP Lozier also opined that Plaintiff had a moderate degree of impairment in his ability to adapt or manage himself. *Id.* at 1278. Included within this domain, NP Lozier noted Plaintiff had a marked degree of impairment in his ability to travel in unfamiliar places or use public transportation; and a moderate degree of impairment in his ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. *Id.*

## II.       STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.      ANALYSIS

### A.       *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step

three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since January 25, 2016, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*)."  AR at 17.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: history of brain aneurysm; hypertension; obesity; right knee early osteoarthritis; anxiety; depression; cognitive disorder (20 CFR 404.1520(c) and 416.920(c))."  *Id.*  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  *Id.*  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity sit 6 hours out of an 8-hour day, stand 4 hours out of an 8-hour day, walk 4 hours out of an 8-hour day[;] [h]e can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds[;] . . . can only occasionally balance, climb, stoop, kneel, crouch and crawl[;] . . . can have only occasional exposure to heights and moving machinery and loud noise[;] . . . is able to understand, remember and carry out simple job instructions only[;] . . . can have only occasional interaction with coworkers, the public and supervisors[;] . . . [and] would require a low stress position[,] [with] [o]ccasional [] defined as very little to one-third of the time."  *Id.* at 19.  At step four, the ALJ found that "[t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."  AR at 23.  At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a)." *Id.* Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 25.

Plaintiff asserts that the ALJ committed error by "fail[ing] to take manipulative limitations into account in the RFC[.]" Opening Br. (Doc. 16) at 8. Plaintiff further asserts that the ALJ erred in "fail[ing] to provide clear and convincing reasons to reject Mr. Puskavich's allegations." *Id.* at 12.

### B. *Residual Functional Capacity*

Plaintiff asserts that "[t]he ALJ acknowledged that neuropsychological testing in 2018 revealed that speeded dexterity was reduced bilaterally and [Plaintiff] was assessed as having slow fine motor dexterity." Pl's Opening Br. (Doc. 16) at 8 (citations omitted). Plaintiff further argues that the ALJ's reasons for failing to take the manipulative limitations into account in the RFC do not withstand scrutiny, and as a result, the RFC is not based upon substantial evidence. *Id.* at 8. Defendant urges that Plaintiff is "asking this Court to reweigh the medical evidence, which is not permitted on appeal." Response (Doc. 17) at 13 (citations omitted).

"At step five, the ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her residual functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999) (citations omitted). "At the hearing, the ALJ poses hypothetical questions to the vocational expert that set out all of the claimant's impairments for the vocational expert's consideration." *Id.* (quotations and citations omitted). "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record." *Id.* (citations omitted).

Here, the ALJ reviewed Plaintiff's allegations, his treatment records, examining physicians' reports, and medical consultants' findings. *See* AR at 19–23. The ALJ found that Plaintiff's "ability to perform all or substantially all of the requirements of . . . [light] work has been impeded by additional limitations." *Id.* at 24. As such, "[t]o determine the

extent to which these limitations erode the unskilled light occupational base, the [ALJ]
asked the vocational expert whether jobs exist in the national economy for an individual
with the claimant's age, education, work experience, and residual functional capacity." *Id.*
The ALJ asked the Vocational Expert to consider a hypothetical individual of Plaintiff's
age, education, and work experience, who could sit for six (6) hours out of an eight (8)
hour day; walk four (4) hours out of an eight (8) hour day; can occasionally lift and carry
twenty (20) pounds; frequently lift and carry ten (10) pounds; can only occasionally climb,
balance, stoop, kneel, crouch, and crawl; can have only occasional exposure to heights,
moving machinery, and loud noise; and has mental restrictions, including only able to
understand, remember, and carry out simple job instructions; only occasional interaction
with coworkers, the public, and supervisors; and requires a low stress position.  AR at 58.
The ALJ defined occasional as "very little to one-third of the time."  *Id.*  The ALJ found
that Plaintiff's "proposed right hand limitations are not fully supported by objective
medical evidence[,]" stating:

> Neuropsychological testing in early 2018 reported that his manual tapping
> speed with his right hand was average (53rd percentile), as it was with his
> left hand (52nd percentile).  Speeded dexterity was reduced with his right
> hand (3rd percentile), as it was with his left hand (<1st percentile).  (Exhibit
> 16F, p. 5.)  Although the claimant was assessed as having slow fine motor
> dexterity, the claimant was working doing on-line research in mid-2017
> through at least early 2018 to earn gift cards.  (Exhibit 14F, pp. 12, 16, 21.)
> The claimant testified to using a computer for three to four hours a day.
> Significant loss of manipulative functions is not supported by the evidence.
> Furthermore, a limitation in manual dexterity was not found in any other
> record in the file.

*Id.* at 25.  The ALJ cited to Plaintiff's statements to his therapist in support of her finding
that he was "working doing on-line research[.]"  *See id.*  NP Lozier's July 6, 2017 note
stated, "Also working doing on-line research which allows him to earn points towards pre
paid Visas to help pay back his mom for her help financially right now."  *Id.* at 1166.  On
September 29, 2017, NP Lozier noted, "Is doing some on line [sic] market research to earn
gift cards that he gives to his mom to help pay down debt but is often frustrated by this

situation." AR at 1170.  On January 5, 2018, NP Lozier indicated, "Still doing some online work to earn gift cards for money but hasn't been motivated to go to do the plasma donation this month." *Id.* at 1175.  Additionally, the ALJ's review of Plaintiff's medical records noted that "[w]hen seen in mid-2016, . . . [t]here was no drift of the outstretched upper extremities[,] [and] [p]ower testing was 5/5 proximal and distal in the upper and lower extremities." AR at 20.

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, — U.S. —, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (quotations and citations omitted).  The Court finds that the ALJ properly considered the entirety of the record in making her determination and the RFC for a range of light work is based on a reasonable interpretation thereof.  *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record").  Furthermore, even if the ALJ did err in not including a manipulative limitation, such error would be harmless.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[W]e may not reverse an ALJ's decision on account of an error that is harmless."), *superseded on other grounds by* 20 C.F.R. § 404.1502(a).

### C.  *Plaintiff's Symptoms*

Plaintiff asserts that "[t]he ALJ failed to provide clear and convincing reasons to reject Mr. Puskavich's allegations."  Opening Br. (Doc. 16) at 12.  Defendant counters that the ALJ properly considered the objective medical evidence, as well as Plaintiff's daily activities and improvement with treatment, in finding Plaintiff's subjective testimony was not entirely supported.  Response (Doc. 17) at 5–13.

#### 1. Legal standard

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to

produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of h[is] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).  "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony.  AR at 19–20.  "After careful consideration of the evidence, the [ALJ] f[ound] that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" *Id.* at 20.  The ALJ then found that "[t]he claimant's statements about the intensity, persistence, and limiting effects of these symptoms are not

fully consistent with the medical evidence and other evidence in the record[.]" *Id.* The ALJ reviewed Plaintiff's treatment in mid-2016, during which Plaintiff "reported stable right hemiparesis and diminished visual acuity, which had been stable since his aneurysmal rupture." *Id.* "Imaging of the brain was unremarkable[,] [and] [Plaintiff] was to be seen for repeat imaging every five years." *Id.* The ALJ noted that "[t]he neurologist reported that the imaging showed no residual whatsoever." AR at 20. In mid-2017, Plaintiff saw another neurologist and despite complaints of "right-sided weakness and subjective memory difficulties . . . was described as providing a very lucid history and was very appropriate." *Id.* The ALJ noted that "[c]onsideration has been given to some evidence of a right-sided limp, although other records report normal gait." *Id.* The ALJ concluded that "[t]he physical and neurologic findings [we]re consistent with the ability to sustain light level work." *Id.* The ALJ also considered Plaintiff's October 2017 neuropsychological testing, as well as his May 2018 neuropsychological evaluation, noting Plaintiff's greatly improved performance in the later testing. *Id.* at 21. The ALJ reviewed Plaintiff's evaluation for right knee pain. AR at 21. The ALJ noted that "[r]ecommendations included injections, exercise and weight loss[,] [and] [t]he claimant was engaged in physical therapy which was helpful." *Id.* (citations omitted). The ALJ also reviewed Plaintiff's "behavioral health care through Pathways." *Id.* The ALJ concluded "[t]hese finding[s] indicate improvement in the claimant's symptoms with treatment." *Id.* The ALJ further noted that "[c]onsideration ha[d] been given to the claimant's self-reported cognitive issues and anger issues and the objective evidence in limiting him to simple, routine tasks and occasional social interaction." *Id.* The ALJ also noted that "[t]he claimant was socializing with friends and a new girlfriend[,] . . . doing chores in the home where he was living[,] . . . [was] engaged in cognitive behavior therapy and was noted to be making progress and taking steps to engage in self-care." AR at 21 (citations omitted). Finding that Plaintiff's statements about his symptoms were inconsistent, the ALJ observed that Plaintiff had "not required acute neurologic treatment[,] [h]ypertension is a condition amenable to medication management[,] [b]ehavioral health treatment has produced improvement as

1   echoed in the neuropsychological evaluation[,] . . . [and] the claimant has been assessed

2   with only mild cognitive impairment." *Id.*

3                    **3. Analysis**

4          Plaintiff urges that "[t]o the extent that the ALJ cites lack of objective evidence as

5   a reason to discount Mr. Puskavich's symptom testimony, failure to comport with objective

6   evidence alone is not a clear and convincing reason to discount symptom testimony."

7   Opening Br. (Doc. 16) at 14.  The ALJ, however, did not rely solely on a lack of objective

8   evidence.    "[E]vidence of medical treatment successfully relieving symptoms can

9   undermine a claim of disability."  *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir.

10  2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)).  Here, as the ALJ noted,

11  Plaintiff showed improvement upon obtaining behavioral health care.  AR at 21; *see also*

12  AR at 1168, 1177–78, 1183, 1185–86, 1188.   Moreover, "[i]mpairments that can be

13  controlled effectively with medication are not disabling[.]"  *Warre v. Comm'r of Soc. Sec.*

14  *Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations omitted).  The ALJ noted that

15  Plaintiff's hypertension was amenable to control with medication.  *See* AR at 21.  The ALJ

16  also properly considered Plaintiff's activities of daily living.   AR at 21; *see also*

17  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) (an ALJ is entitled to consider

18  "whether the claimant engages in daily activities inconsistent with the alleged symptoms").

19  The Court finds that the ALJ's symptom "finding is supported by substantial evidence in

20  the record, [and as such,] we may not engage in second-guessing."  *Thomas v. Barnhart*,

21  278 F.3d 947, 959 (9th Cir. 2002) (citations omitted).

22  . . .

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28  . . .

IV.    **CONCLUSION**

Based on the foregoing, the Court affirms the ALJ's decision.  Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 16) is DENIED;

2)    The Commissioner's decision is AFFIRMED; and

3)    The Clerk of the Court shall enter judgment and close its file in this case.

Dated this 30th day of April, 2021.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge